0.106 of an Acre of Land in Brandywine Hundred, New Castle County and State of Delaware, William F. Mink, and Ella May Mink, his wife, Appellants, Defendants Below, v. The State of Delaware, *ex rel.* J. Gordon Smith, *et al.*, Appellees, Plaintiffs Below.

*(March* 14, 1957.)

Southerland, C. J., and Wolcott and Bramhall, J. J., sitting.

*William F. Lynch, II,* for appellants.

*Joseph P. Hurley* for appellees.

Supreme Court of the State of Delaware, No. 38, 1956.

WOLCOTT, J.:

The facts giving rise to this litigation are briefly stated. The appellants are owners of a tract of land lying along the northerly side of the Concord Pike near Talleyville in New Castle County. In 1954 the State Highway Department approved as a part of its 1954 construction program the widening of the Concord Pike from Talleyville to the Pennsylvania State Line, and engaged an engineering firm to prepare plans for the project and to make all field surveys, designs, etc. These plans were completed and submitted to the Chief Engineer of the State Highway Department. The plans consisted of a proposed route for the widened highway, its general design and width, the composition of the paved area, the width of the median strip and the width of the shoulder area. The Chief Engineer examined the plans, made some changes and finally accepted them about July 15, 1956.

The project is part of the Federal Aid Program for the construction of state highways under which the Federal government pays to the state 50% of the total cost as a grant-in-aid. Under the conditions of the grant-in-aid program, all plans and specifications must meet the standards and requirements of the United States Bureau of Public Roads, and must be submitted to it for its approval. The Bureau approved the plans on or about July 25, 1956.

Thereupon, the Chief Engineer of the State Highway Department advertised for bids. On August 23, 1956 a contract for the proposed project was let to the successful bidder who immediately commenced preliminary grading, which has now ceased at the property line of the appellants who have refused to grant the State Highway Department or its contractor access to their land.

It should be noted that at no time were the plans, field surveys, designs, etc., submitted to the State Highway Department as a body for its approval or disapproval. The only formal action taken by the State Highway Department concerning the particular project was the before-mentioned inclusion of it in the construction program for 1954 and a subsequent reapproval of the same project in 1956, and the awarding of the contract to the successful bidder. The 1956 approval was included in a general approval of the 1956 construction program in the following form:

"* * * Concord Pike, Talleyville to Pennsylvania Line. 2.055 miles in length, widening to dual; approximately four hundred thousand dollars."

Early in July, 1956 the Chief Engineer instructed the right-of-way agent of the Department to obtain the necessary land to carry out the widening project of the Concord Pike. Shortly thereafter, the right-of-way agent met with one of the appellants and showed him the plans, pointing out the amount of the appellants' land that would be required for the project. No offer of purchase was made at this time.

On July 16, 1956 the right-of-way agent and the same appellant again met, at which time an offer of purchase of $2400 plus an amount to cover destruction of shrubbery was made, which offer was summarily rejected as "ridiculous". At the same meeting the right-of-way agent explained the right of the Department to condemn the land and suggested that local appraisers value the land in order to arrive at a fair price. It was thereupon understood that the right-of-way agent would employ two local real estate agents to appraise the premises and would thereafter further negotiate for the purchase of the land in question.

Within two weeks thereafter the right-of-way agent instructed counsel for the Department to commence condemnation proceedings which were actually instituted on August 17, 1956.

Meanwhile, the right-of-way agent obtained an appraisal and, on August 16, called the appellant and made a new offer

of $3400, which was likewise rejected. It was then suggested that the appellant have an appraisal made on his own behalf. Before this was done he was served with process in the condemnation proceeding and thereafter negotiations for the purchase of the land ceased.

The appellants filed an answer in the proceedings denying the right of the State Highway Department to condemn the land in question, and a motion to dismiss on the ground that the jurisdiction of the court had been prematurely invoked because there had been no valid appropriation of the land and because a *bona fide* effort had not been made to purchase it. This motion was denied and from the denial this appeal has been taken.

Initially, it should be stated that the appellants raise no question as to the public necessity for the taking of their land, or as to the amount of land it is proposed to take. They question solely the propriety of the manner in which the State Highway Department is purporting to exercise the power of eminent domain conferred by statute upon it.

Basically, the argument of the appellants is that the exercise by the State Highway Department of the right of eminent domain conferred upon it by act of the General Assembly must be exercised "in strict compliance with the statute". They do not deny that the State Highway Department has the right to condemn and acquire their land if the condemnation proceeding conforms to the requirement of the statute.

The right of eminent domain is granted in general terms to the State Highway Department by 17 *Del. C.* § 132(c) (4) which authorizes the Department to:

"Acquire by condemnation or otherwise any land, easement, franchise, material or property, which, in the judgment of the Department, shall be necessary therefor, provided, that the Department shall not reconstruct a highway unless there will result a net saving or reconstruction; * * *"

By 17 *Del. C.* § 138, the manner of exercise of the power of eminent domain by the Department is prescribed in the following language:

"Whenever the Department cannot agree with the owner of any land, * * for the purchase thereof, the Department may, in the exercise of the power of eminent domain, acquire the same by condemnation * * *.'"

Relying upon the two quoted sections of the *Code*, the appellants take the position that the State Highway Department, in exercising the power of eminent domain delegated to it, must do so by appropriate resolution to condemn the particular land in question, and that a prerequisite to the exercise of such power is an exhaustion of negotiations with the owner of the land for the purchase thereof. They rely on the general rule that the power of eminent domain may be exercised by a state agency to which the power has been delegated only by strict compliance with the authorizing statute.

Appellants' first point is that the manner in which the decision to institute condemnation proceedings in the case before us was reached amounts to an improper delegation of the power of eminent domain by the State Highway Department to its Chief Engineer, because the statute delegating the power to the Department does not authorize its redelegation by the Department. Nor, say the appellants—and the record does not disclose the contrary—was there in fact any resolution by the Department purporting to authorize the Chief Engineer to institute condemnation proceedings within his sole discretion.

The general rule relied on by appellants is set forth in 1 *Nichols on Eminent Domain*, 3rd ed., § 3.211 in the following language:

"§ 3.211 *Redelegation of the power.*

"The delegation of the power of eminent domain to a particular public or corporate body or to an officer or other person is, in theory of law at least, a personal trust, and, unless the legis-

lature has provided for the redelegation of the power, the party to whom such power has been delegated cannot assign or delegate it to anyone else. It is for this reason that a lease or sale of all the property and franchises of a corporation invested with the power of eminent domain does not carry with it the right to exercise the power, and that a public or corporate body or board authorized to take such land as it may need for the public use, while it may employ civil engineers and other like assistants and may depend to a great extent upon their advice, must itself exercise the final choice in selecting the necessary land."

The appellants also cite as authority the *Ontario Knitting Co. v. State*, 205 *N. Y.* 409, 98 *N. E.* 909; *Lyon v. Jerome*, 26 *Wend., N. Y.*, 485; *Jefferson County v. Horbiger*, 229 *App. Div.* 381, 243 *N. Y. S.* 30; *Ruddock v. City of Richmond*, 165 *Va.* 552, 178 *S. E.* 44, 183 *S. E.* 513.

We do not feel called upon to discuss in detail the case authorities cited by the appellants, even though we think they are distinguishable from the case before us, and even though we think the precise authorities relied upon lay down an unworkable rule which, in the last analysis, would require a condemning authority to meet in all solemnity and adopt a resolution condemning a particular piece of land by metes and bounds. We think such a rule unrealistic in the light of the requirements of the development of a modern highway system which requires for its expansion not only the acquisition of land but, to acquire such, the frequent use of the power of eminent domain. The amount of land necessary to be acquired is fixed by certain unalterable standards and specifications required, either by the State Highway Department or, as in the case before us, by the United States Bureau of Public Roads.

We accept as a general principle the statement quoted from *Nichols on Eminent Domain* and adhere to it as a guide in the question of the right to delegate the power of eminent domain. Notwithstanding this, we think the appellants' position is erroneous, because we think the State Highway Department statute,

itself, delegates to the Chief Engineer of that Department broad powers and authority, among which is the right to exercise in the Department's behalf its power of eminent domain to accomplish a road project which has received the approval of the Department.

Reference to the appropriate code sections will demonstrate our view. 17 *Del. C.* § 111 creates the State Highway Department to consist of twelve members divided among the state according to a geographic distribution. § 115 of that title prohibits the members of the Department from receiving any compensation for their services, but does allow them actual expenses incurred while engaged in the affairs of the Department.

By 17 *Del. C.* § 116 the office of Chief Engineer of the Department is established and his qualifications prescribed. By this section it is provided that he shall have been an active civil engineer for ten years, five years of which shall have been in responsible charge of road engineering, and that he shall be qualified to design "as well as to direct road engineering work". This section also fixes as a matter of law the salary of the Chief Engineer.

17 *Del. C.* § 117 prescribes the powers and duties of the Chief Engineer, among which are the preparation of surveys and maps, and the collection of information concerning traffic and any other detail which will assist in maintaining a highway system in the state. He is directed from time to time to recommend to the Department a program for the improvement of the state's highways, to estimate the probable cost of construction or reconstruction, and from time to time to modify any of his recommendations. He is specifically given "charge and supervision of all engineering work" and of the maintenance of all state highways, and he is given the right to discharge any employee of the Department.

These sections of the code point up the fact that the Chief Engineer of the State Highway Department is an extremely important officer in that Department, to whom the General Assem-

bly has delegated the daily discharge of the duties and functions of the Department. He is a salaried fulltime employee, as opposed to the members of the Department, itself, who are non-paid, non-professional appointees. We think the cited sections of the statute relating to the State Highway Department and to the Chief Engineer force the conclusion that the members of the Department, who meet only periodically, act in the capacity which in private corporate activities is filled by a Board of Directors, and that the Chief Engineer is the executive head of the Department charged with the responsibility of carrying out the broad policy decisions made by the members of the Department.

This conclusion is further strengthened by 17 *Del. C.* §§ 151, 152 and 154 relating to the awarding of contracts in furtherance of various road projects approved by the Department. Thus, § 152 provides that whenever the Department approves any road construction the Chief Engineer shall prepare plans and specifications for the work required and shall thereupon advertise for bids to do the construction work. This section does not require the Chief Engineer to submit the plans and specifications thus prepared to the Department for its approval or disapproval before the bids are solicited.

§ 154 provides that when the sealed bids have been received, the contract shall be awarded by the Department to the lowest responsible bidder "unless in the opinion of all the members of the Department and the Chief Engineer" the interests of the State would be best served by awarding the bid to a contractor other than the lowest bidder. This section is particularly significant in determining the scope of responsibility and authority of the Chief Engineer because his approval is required to enable the Department to act, and he in fact is granted an effective veto over what might well be the unanimous desire of all the members of the Department.

Finally, § 158 directs that the execution and performance of all contracts awarded by the Department shall be under the charge of the Chief Engineer.

If the contention of the appellants were accepted, the various code sections referred to—which we think amount in their entirety to a delegation to the Chief Engineer of broad responsibilities in the exercise of the powers granted to the State Highway Department—would be stultified. For example, it is obvious that until plans and specifications are made there is no way of knowing in advance precisely what land would be required for the construction of the particular highway, the project for which has already been approved. The statute charges the Chief Engineer solely with the responsibility of preparing the plans and specifications, without the necessity of submitting them to the Department as a whole. The requirement, therefore, which the appellants urge upon us, that the Highway Department, itself, adopt a resolution authorizing the condemnation of the particular pieces or lots of land required to enable the project to go forward, would be to require the members of the Department to exercise their discretion upon a matter concerning which they know nothing, and concerning which, under the statute, the Chief Engineer is required to tell them nothing. This alone makes it apparent that to require approval by the Department by formal resolution under such circumstances would be merely to require a sterile gesture. We cannot think that the General Assembly intended shadow instead of substance.

We, therefore, conclude that the Chief Engineer was within his authority in directing the institution of condemnation proceedings to acquire land required to complete a road project, the over-all approval of which the Department had theretofore given. We further conclude that the power thus exercised by the Chief Engineer was not delegated to him by the Department, but was delegated to him by act of the General Assembly, concerning the right of which to delegate there is no dispute.

The second argument made by appellants is that 17 *Del. C.* § 138, providing that only in the event of inability to agree on the purchase may condemnation be started, requires as a condition precedent to the exercise of the power of eminent domain that the Department shall have made a *bona fide* effort

to purchase the land in question and have been unable to agree upon the purchase thereof.

The general rule seems to be that similar statutory provisions require the condemning authority to make a *bona fide* attempt to purchase the land in question as a condition precedent to the exercise of the power to condemn. 6 *Nichols on Eminent Domain* (3rd Ed.), § 24.62; *Lewis on Eminent Domain* (3rd Ed.), § 497. Indeed, the Department concedes that such is the statutory requirement.

The trial court held that the Department made a *bona fide* effort to purchase from the appellants and thus had satisfied the statutory requirement. We agree. The facts are that the right-of-way engineer and the appellants met on July 3, 1956 at which time the subject of acquisition of the land was discussed, but no offer of purchase made. On July 16, 1956 at the next meeting, the Department made an offer of $2400 which was rejected as "ridiculous". At this second meeting it was agreed that appraisers would be retained by the Department. This was done and on August 16, 1956, the right-of-way engineer called the appellants on the telephone and made an increased offer of $3400, presumably on the basis of the appraisers' report. This second offer was rejected. It was then suggested to the appellants that they get their own appraisers. The proceedings to condemn were actually filed the next day.

It is true that following the second meeting of the parties instructions were given on July 31, 1956 to the Department's attorney to commence condemnation proceedings, but these instructions do not alter the fact that the Department's representative continued to negotiate by the submission of a second and substantially greater offer of purchase before the proceedings were actually commenced. Nor, did the actual instituting of the action preclude further negotiation, for amicable settlement could undoubtedly have been made at any time if the appellants had been willing to accept the Department's offer. That they were unwilling to do so is clear, not only from their

actual rejection of it, but from their vigorous contest of the Department's right to condemn. Under the circumstances, we think the Department tried but was unable to purchase the land in question.

We think the purpose of the statutory condition to the exercise of the right to condemn is the protection of the land-owning public from arbitrary and unexpected exercise of the power. In this instance the owners knew that the Department proposed to acquire a portion of their land, by condemnation if necessary. Two offers of purchase were rejected by them as inadequate. The dispute fundamentally thus became one of valuation which, as far as we know, could be settled only by the judicial process of condemnation, specifically designed to resolve conflicting claims of value and to award just compensation to the owner for the taking.

We think the owners have received all that they were entitled to, *viz.*, knowledge of the imminence of the taking and an opportunity to negotiate. To be sure, the owners saw fit not to name any figure for which they would be willing to sell. They were within their rights to refuse to do so, but we think that they may not complain that the Department, after the rejection of two successive offers to purchase, elected to submit the dispute to a tribunal designed by law to decide it finally.

We conclude, therefore, that the institution of these proceedings at the direction of the Chief Engineer of the Highway Department was in accordance with the statute, and that a *bona fide* attempt to purchase the land had been made prior to the institution of suit.

The judgment below is affirmed.

BRAMHALL, J. (dissenting).

I disagree with the finding of my colleagues that the judgment of the lower court should be affirmed. Our difference arises out of the fact that I can find no authority in the statute involved or in the record any authorization of the State Highway

Department directing the chief engineer to institute condemnation proceedings on behalf of the State Highway Department.

As I interpret the opinion of the majority, the general principle of law as set forth in 1 *Nichols on Eminent Domain*, 3d Ed., § 3.211 (quoted in the majority opinion) that a delegation of the power of condemnation constitutes a personal trust and may not be assigned or delegated to anyone else unless such assignment or delegation is provided for by the legislature, is not disputed. The thrust of that opinion, as I read it, is that in the statute itself there is delegated to the chief engineer of that Department very broad powers and authority, among which, say the majority, is the right to exercise in the Department's behalf its power of eminent domain for the purpose of accomplishing a road project which has received the general approval of the Department. They say that the authority given to the chief engineer is in the nature of a "board responsibility".

The authority of the State Highway Department to institute condemnation proceedings arises under the provisions of Title 17, *Del. C.* 1953, § 132(c) (4) and § 138. The authority therein is specifically given to the Department, not to the chief engineer. Section 139, which prior to the *Code of* 1953 was a part of the same section, provides for the method and procedure of condemnation to be followed "by the Department". The authority given to the chief engineer seems to relate chiefly to the carrying out of the work directed by the Department to be performed. In § 117 he is directed to prepare maps, etc., relative to traffic, recommendations to the Department of a road program or modification thereof, supervision of engineering work, maintenance of roads and such other duties which may be required of him "by the Department". This section is entirely silent to any authority given to the chief engineer relating to the institution of condemnation proceedings.

The approval by the Department of the New Castle County Road Project for 1956 includes the road in question. Other than the fact that this road program was approved—as far as anything in the record is concerned, at least—no other language or

authority was added to this approval. While the plans were approved by the United States Bureau of Public Roads, they were not submitted to the Department for approval. In fact, I find nothing in the record showing specifically that they were even approved by the chief engineer.

I agree that the Act gives to the chief engineer some authority which is in the nature of a "board responsibility". I also agree that within the sphere of his responsibility it was the intention of the legislature to give to the chief engineer very broad powers. On the other hand, it is crystal clear that in every case relating to a matter of policy the statute provides that the decision shall be made by the Department. The only instances which might be construed as an exception to this statement are cases in which the legislature desired to insure against irregularities in the award of contracts and in the performance of work without a contract by increasing the number of members of the Department generally necessary to carry on the business of the Department by providing also for the approval of the chief engineer.

An analysis of the sections referred to in the opinion of the majority does not, in my opinion, sustain the conclusion reached in that opinion. I shall discuss briefly the sections relied upon by the majority as authority for their position.

Sec. 151. This is purely a limitation on the part of the Department to prevent anyone, under the guise of declaring the existence of an emergency, from proceeding with any work without following the prescribed course in receiving bids and awarding a contract to a favored contractor. The provision that two-thirds of the members of the Department, instead of a majority, must concur and that the engineer must consent is merely a safeguard to prevent any irregularity. It might also be said that this work is also peculiarly within the forte of the chief engineer.

Sec. 152. In the opinion of the majority, as evidence of the broad authority of the chief engineer, attention is called to the

fact that in this section the chief engineer is not directed to submit plans and specifications to the Department. I agree that the chief engineer has very broad authority in the performance of his duties as those duties are circumscribed by the statute. The preparation of the plans and specifications are what might be loosely termed as procedural matters and peculiarly within the knowledge and experience of the chief engineer. However, with respect to this section, I call attention to the fact that it is therein provided that the contract shall be awarded *by the Department*.

Sec. 154. In this section it is provided that contracts shall be awarded by the Department to the lowest responsible bidder, "unless in the opinion of *all* of the members of the Department and the Chief Engineer" the interest of the State would be best served by awarding the bid to a contractor other than the lowest bidder.

This is also clearly a specific provision inserted as a safeguard to insure that no responsible bid which is the lowest bid submitted shall be rejected unless everyone involved in receiving the bids agree. It will be noted that the statute does not even permit this to be done by a majority of the members of the Department but only by all of its members, acting with the chief engineer. Clearly the addition of the name of the chief engineer as one who must also agree was but an additional safeguard against any irregularity in the awarding of contracts for road construction.

Sec. 158. It is provided in that section that the chief engineer shall have charge of the execution and performance of all contracts *awarded by the Department* and his decision in all matters concerning the *performance of the work and compliance with the terms of the contract* shall be final.

If the Department had directed the chief engineer to institute condemnation proceedings, I would assume that the chief engineer could proceed with the condemnation proceedings on behalf of the Department. He would merely be carrying out the

direction of the Department. Such authority may not be inferred from the nature of the work which he does. No such inference can be made in cases of condemnation.

The majority says that to require a resolution of the Department to authorize the condemnation of particular pieces of land would be to require the members of the Department to exercise their discretion upon a matter concerning which they know nothing and concerning which, under the statute, the chief engineer is required to tell them nothing.

I think that it is reasonable to infer that the legislature in creating that Department assumed that the persons who should be appointed as members of that Department would acquire such specific knowledge of matters entrusted to them by experience and study that they would become efficient in dealing with the problems presented from time to time in the activities of the Department. Absent anything in the record in this case to the contrary, I think it is a fair assumption to say that they have done so.

As to the obligation of the chief engineer to the Department, it is sufficient to note that he is employed by the Department and in some respects at least is responsible to it. Section 117 provides that he shall keep the Department informed concerning traffic, improvements and the nature thereof and "such other details of information as will give assistance in maintaining a system of State highways as required by this chapter." It is also provided that the chief engineer "shall perform such other duties as may be reasonably required of him by the Department".

The extent to which authority for condemnation may be exercised is limited to express terms or clear implications of the statute and may not be implied from vague or doubtful language. 18 *Am. Jur.* 650, Eminent Domain, § 26; *Burnham v. Mayor and Aldermen of Beverly*, 309 *Mass.* 388, 35 *N. E.* 2d 242, 135 *A. L. R.* 750; *Ruddock v. City of Richmond*, 165 *Va.* 552, 178 *S. E.* 44, 183 *S. E.* 513; *Jefferson County v. Horbiger*, 229 *App.*

*Div.* 381, 243 *N. Y. S.* 30; *Blanton v. Fagerstrom,* 249 *Ala.* 485, 31 *So.* 2d 330, 172 *A. L. R.* 128; *Ontario Knitting Co. v. State,* 205 *N. Y.* 409, 98 *N. E.* 909.

There is no such express language or any clear implication to be found in the statute. In fact, the intention of the legislature that such discretionary powers shall be vested in the Department seems to me clearly demonstrated by the fact that in the other sections of the Act, with the exception of the section failing to award the contract to the lowest responsible bidder and the section authorizing the doing of the work in emergencies without awarding the contract, all matters involving discretionary authority, is specifically vested in the Department.

I am of the opinion that the language of the statute falls far short of giving any clear authority to the chief engineer to institute condemnation proceedings in this case. The most that can be said relating to the approval of the New Castle County Road Project, in which the road in question was included, is that by reason of such approval the chief engineer was authorized to proceed with the construction of the roads giving him specific authority. No authority to institute condemnation proceedings may be implied or inferred.

For the reasons given here, it is my opinion that the judgment of the Superior Court should be reversed.